IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JANE ROE, )
)
          Plaintiff, )
v. ) No. 05-4333-CV-C-DW
)
LARRY CRAWFORD, et al., )
)
          Defendants. )

ORDER

Before the Court are Parties' cross-motions for summary judgment. (Docs. 57 and 60). For the following reasons, Plaintiffs' Motion for Summary Judgment (Doc. 57) is GRANTED. Defendants' Motion for Summary Judgment is DENIED.[1]

I.    Factual Background

This case stems from the official policy of the Missouri Department of Corrections ("DOC") prohibiting transportation of pregnant inmates off-site to provide abortion care for nontherapeutic abortions.[2] Missouri DOC maintains two institutions for female offenders: Women's Eastern Reception, Diagnostic and Correctional Center ("WERDCC"), and the Chillicothe Correctional Center. All pregnant inmates are incarcerated at WERDCC.

DOC transports inmates from DOC institutions for, among other things, court appointments,

---

[1] Both Plaintiffs' and Defendants' Motions for Summary Judgment address identical legal arguments and, as discussed below, present no genuine issues of material fact. Accordingly, the Court addresses the motions and legal arguments therein simultaneously.

[2] Defendants refer to nontherapeutic abortions as "elective." The Court uses these terms interchangeably.

1

medical appointments, work release, intra-institution transfers, and occasionally to take the State Board of Cosmetology examination. Any departure from institutional grounds is referred to as an "outcount." WERDCC handles approximately eight outcounts per day, seven days a week, averaging 197 outcounts per month in 2005.

DOC contracts with Correctional Medical Services ("CMS") for the provision of medical care to inmates in the Department's custody. CMS provides a range of health services on-site at WERDCC, including dental care, mental health care, radiology, optometry and mammography. When an inmate requires specialized medical, mental health, or dental services beyond the capability of the on-site health care system, CMS personnel refer her to an off-site specialist or facility. For all off-site medical appointments, CMS personnel schedule the appointment and notify the office of the Chief of Custody of the date and time. The office of the Chief of Custody is responsible for making the necessary security and transport arrangements. Of the roughly 200 outcounts that the Chief of Custody handles per month, about 155 are for medical care. Given the volume of medical outcounts, it is not uncommon for the office fo the Chief of Custody to reschedule or rearrange appointments depending on staff and vehicle availability.

In any given month, there are anywhere from 35 to 50 pregnant inmates at WERDCC. CMS provides pregnancy-related care to these inmates on site, but also transport inmates off-site for obstetrical or gynecological care. In 2005, Defendants transported approximately 91 inmates off-site for labor and delivery. An inmate in labor is transported to the hospital without any restraints, regardless of her custody level. Two officers typically provide the transport and one officer will remain with the inmate at the hospital throughout the duration of her stay, anywhere from one to three days, on average. Defendants pay for all the costs associated with prenatal care and childbirth,

2

including transportation and security.

For several year prior to July 2005, Defendants had provided access to nontherapeutic abortion services to inmates who wished to terminate their pregnancies. Pursuant to the DOC policy under which these outcounts would occur, neither WERDCC nor DOC is involved in the process of obtaining an elective abortion for an inmate. The inmate and her social worker would be responsible for determining the cost of the procedure and scheduling the procedure.

From 1998 to 2005, Defendants transported seven inmates for abortion services, each of which was considered elective by Defendants. Under the former policy, the abortions are typically performed at Reproductive Health Services of Planned Parenthood of the St. Louis Region (RHS), and all inmates are responsible for paying for the abortion procedure. Two female corrections officers accompany the inmate to RHS for the procedure, which typically takes one 8-hour shift. While inmates arrive at RHS with wrist restraints, they are not restrained during the procedure.

During this time in which Defendants provided transport for abortion services, no security problems were reported during any abortion-related outcount, nor did transport of an inmate for an abortion cause delays in another inmate receiving medical care. When compared to DOC's general budget, the costs to DOC for an abortion outcount are, according to Defendants, "infrequent" and "minimal." Moreover, the costs associated with an abortion outcount are similar to the general costs associated with medical transports.

In early 2005, the issue of discontinuing transports for abortion services first arose. At this time, DOC was facing considerable budget cuts. Hearings were held on the Department's budget and Defendants were questioned by the Missouri House and Senate about the practice of transporting inmates for abortion services. Defendants were contacted by the legislative branch, both via letter

and in person, regarding concerns over transports for elective abortions. Up until July 2005, the Policy remained unchanged.

On or about July 6, 2005, Defendants received a request from inmate JT[3] for an abortion. Her request was initially approved by Defendant Cynthia Prudden, then Acting Superintendent of WERDCC. An abortion appointment was scheduled for July 8, 2005 but the procedure was postponed pending approval at the executive level. At the request of Steve Long, Acting Director of the Division of Adult Institution, Patricia Cornell, Assistant Director of the Division of Adult Institution, prepared a memorandum reviewing the impact abortion transports had on DOC's costs and resources. Comparative costs to DOC in providing inmates with pregnancy related care, including transporting pregnant inmates for prenatal care and labor and delivery were not considered at this time, or thereafter. On July 19, 2005, Long informed Prudden, via memorandum, that JT's request was denied because the procedure was elective and not required to maintain her health. He stated that the transport "presents unnecessary security risks and requires staff resources that are better utilized in other operational areas. Additionally, state statute prohibits the use of our funds to assist with an abortion that is not necessary to save the life of the mother."

On August 22, 2005 Plaintiff Jane Roe was transferred to WERDCC from California custody. Roe was initially admitted WERDCC in early 2005 on a drug charge. She was subsequently paroled, but re-arrested in California for violating the conditions of her probation. She learned of her pregnancy while in custody in California and requested access to abortion services at that time. Before she could obtain the procedure, however, she was returned to Defendants' custody and

---

[3]To protect inmates' confidentiality, inmates are referred to by their initials or by a pseudonym.

4

Case 2:05-cv-04333-DW   Document 87   Filed 07/18/06   Page 4 of 18

readmitted to WERDCC. Upon readmittance, Roe asked Defendants for access to abortion services and subsequently repeated this request to various medical and non-medical personnel at WERDCC. Her request was denied on August 30, 2005.

Upon the decision of Larry Crawford and Steve Long, in consultation with General Counsel Daniel Gibson, on September 5, 2005, DOC Policy IS11-58 was revised to state in relevant part, that Defendants will transport inmates for abortion care if "an abortion is indicated due to threat to the mother's life or health, and if approved by the Medical Director in consultation with the Regional Medical Director." According to Crawford, the reason for the Policy change was prompted by concerns over "security, staff, money and a statute that clearly was not encouraging and may actually be saying that it was unlawful for a nonmedical [sic] purpose."

Plaintiff Roe, after contacting counsel and attempting to administratively resolve the matter of Defendants' August 30 denial of her request, sought emergency temporary relief from this Court on October 12, 2005. On October 13, 2005, the Court granted Plaintiff's Motion for a Preliminary Injunction and ordered Defendants to transport Plaintiff for the purpose of providing medical services to terminate her pregnancy. After a series of delays prompted, in part, by Defendants' outright refusal to comply with the Court's Order, Plaintiff Roe was transported to RHS on October 20, 2005 to receive medical services to terminate her pregnancy. Thereafter, Plaintiff amended her Complaint and moved to certify the action as a class action. On November 28, 2005, the Court certified the following class pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All pregnant women who are seeking or may in the future seek non-therapeutic abortions and who are in the custody of Defendants at the time Plaintiff Roe filed her Verified Complaint in this case or who will be placed in the custody of Defendants in the future and may while in the custody of Defendants seek a non-therapeutic abortion.

5

II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Issues of fact must be material to a resolution of the dispute between the parties; where the only disputed issues of fact are immaterial to the resolution of the legal issues, summary judgement is appropriate. Case v. ADT Automotive, 17 F. Supp. 2d 1077 (W.D. Mo. 1997) (citing Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992)).

In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. Anderson v. Liberty Lobby, 477 U.S. 242, 252-255 (1986); Inland Oil and Transport Co. v. United States, 600 F.2d 725, 727 - 28 (8th Cir.), cert. denied, 444 U.S. 991 (1979).

III.  14th Amendment Claim

Plaintiffs' first claim alleges that Defendants' Policy violates Plaintiffs' Fourteenth Amendment right to an abortion, as articulated in Roe v. Wade, 410 U.S. 114 (1973) and reaffirmed in Planned Parenthood v. Casey, 505 U.S. 833 (1992).

A.  Standard of Review

It is well-settled that imprisonment does not automatically deprive a prisoner of his or her constitutional rights or valid constitutional claims.[4] Turner v.Safely, 482 U.S. 78, 84 (1987).

---

[4] In various instances throughout the briefing of these motions, Defendants argue that many of inmates' constitutional rights are *completely foreclosed* as a result of incarceration, including the right to receive an abortion. Defendants' argument in this respect is unfounded.

Imprisonment does permit greater restriction of constitutional rights than would otherwise be constitutionally valid and many constitutional rights enjoyed prior to incarceration are curtailed or lost upon imprisonment. Beard v. Banks, 126 S.Ct. 2572, 2577-78 (2006); Overton v. Bazzetta, 539 U.S. 126, 128 (2003). As a matter of longstanding general principle, a prison regulation that impinges upon inmates' constitutional rights is valid "if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. More recently, however, the United States Supreme Court has held that a prison regulation impinging on inmates' right to be free from racial discrimination should be analyzed under a strict scrutiny standard of review, not pursuant to the Turner reasonable-relationship test. Johnson v. California, 543 U.S. 499 (2005). In so ruling, the Court stated that Turner applies only to those rights "inconsistent with proper prison administration." Id. at 510.

Plaintiffs argue that in light of Johnson, the Court should scrutinize their Fourteenth Amendment claim not pursuant to Turner, but under the same standard of review that would apply outside of the prison context – the Casey undue burden test. Casey, 505 U.S. 833.

This argument warrants a brief discussion of both Turner and Johnson. In Turner, the court was presented with constitutional challenges to two rules: one barring inmate-to-inmate correspondence and another restricting inmate marriage. Turner, 482 U.S. at 91-93. Turner balanced the principle that certain constitutional rights survive incarceration with the principle that prison administration is best left to the legislative and executive branches, not federal courts. Id. at

---

Federal courts have taken great pains to recognize the valid constitutional claims of inmates and to make clear that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner, 482 U.S. at 84 (quoting Procunier v. Martinez, 416 U.S. 396, 405-406 (1974)).

7

84-85. In balancing these considerations, Turner held that a prison regulation that impinges upon an inmate's constitutional rights is valid if "it is reasonably related to legitimate penological interests" and articulated four factors relevant in determining the constitutionality of a regulation.[5] Id. at 89. The Supreme Court upheld the rule barring inmate-to-inmate correspondence as constitutional and invalidated the regulation restricting inmate marriage.

In Johnson, the plaintiff brought an equal protection challenge to a prison policy that placed new or transferred inmates with cellmates of same race during initial evaluation. The Court of Appeals evaluated the prison regulation under Turner and upheld the regulation as reasonably related to a legitimate penological interest. Upon review, the Supreme Court reversed, holding that the regulation should have been subject to a strict scrutiny review rather than the more lenient Turner standard. In so ruling, the Court emphasized that the Turner reasonable-relationship test is applied "*only* to rights that are 'inconsistent with incarceration.'" Johnson, 543 U.S. at 510 (citations omitted). The Court reasoned that the right to be free from racial discrimination is not a right "that need necessarily be compromised for the sake of proper prison administration" and therefore is not susceptible to the logic of Turner. Id. at 510 (quotations and citations omitted).

Plaintiffs argue that a woman's due process right to choose to terminate a pregnancy is, like the right not to be discriminated against based on one's race, not a right that need necessarily be compromised for the sake of proper prison administration. Id. at 510. Under this reasoning, the

---

[5]These factors, discussed more throughly below, are as follows: (1) whether the policy rationally and actually advances a neutral and legitimate government interest; (2) whether the prisoner has alternative means of exercising the same right; (3) the effect proposed accommodations will have on prison resources; and (4) whether the existence of obvious, easy alternatives that impose a *de minimis* cost reflect the unreasonableness of the regulation. Turner, 482 U.S at 89-91.

8

Defendants' Policy would be subject to the undue burden test articulated in Casey.

The Court declines to read Johnson so broadly. The Supreme Court has consistently held that incarceration necessarily limits many privileges and rights, and in Johnson, expressly referred to many rights that may be so limited, such as First Amendment challenges to prison regulations, restrictions on freedom of association, limitations on inmate correspondence, restrictions on inmates' access to courts, restrictions on receipt of subscription publications, the involuntary medication of mentally ill prisoners, and restrictions on the right to marry. Id. at 1149 (citations omitted). The Court finds that a due process claim challenging a restriction on a woman's right to have an abortion is more similar to a due process claim challenging a restriction on the right to marry than it is to an equal protection challenge to a raced-based prison regulation. A woman's right to terminate her pregnancy is encompassed by the right of privacy founded in the Fourteenth Amendment's concept of personal liberty. Roe v. Wade, 93 S.Ct. 705, 727 (1973). This right is far from unqualified; the Supreme Court in Roe expressly rejected the idea that the right to have an abortion is unlimited. Id. at 727. In contrast, the right to be free from racial discrimination has, in all circumstances, including the prison context, been zealously guarded from encroachment by the Supreme Court. See, e.g., Johnson 543 U.S. at 505. This Court agrees with Chief Judge Walker of the Northern District of California, who opined that Johnson "appeared to reaffirm the application of Turner's reasonable relationship analysis to 'rights that are inconsistent with proper incarceration,'" specifically, freedom of association, a right referred to in Johnson as one that may be properly limited in the prison context. Stewart v. Alameida, 418 F.Supp.2d 1154, 1162 (N.D. Cal. 2006). This Court accordingly holds that as Johnson expressly affirmed that some due process claims are properly analyzed under Turner, Plaintiffs' instant due process claim is most properly analyzed under Turner.

9

Furthermore, no court to consider <u>Johnson</u> has interpreted its holding as broadly as Plaintiffs here suggest. See e.g., <u>Tolbert v. McGrath</u>, No. C 04-3039 SI (PR), 2005 WL 3310065 at *6 (N.D. Cal., Dec. 7, 2005) (citing <u>Johnson</u> for the proposition that "[w]here a prison regulation (other than a race-based one) impinges on inmates' constitutional rights, the regulation or practice is valid if it is reasonably related to legitimate penological interests"); <u>Meggett v. Penn. Dept. of Corr.</u>, 892 A.2d 872, 885 (Pa. 2006) (limiting <u>Johnson</u> to the holding that "<u>Turner</u> was never intended to extend to equal protection cases that arise in prison that implicate suspect classes.").

Accordingly, the Court declines to analyze Plaintiffs' Fourteenth Amendment claim under <u>Casey</u> and instead will apply the four-part test announced in <u>Turner</u>.

      B.      <u>Analysis</u>

As stated above, under the standard articulated in <u>Turner</u>, prison regulations that curtail constitutional rights are valid only if they are "reasonably related to penological interests." <u>Turner</u>, 482 U.S. at 89. To determine whether a policy that restricts inmates' constitutional right is reasonably related to a legitimate penological interest, courts consider (1) whether the policy "rationally and actually advances a neutral and legitimate government interest; (2) whether the prisoner has alternative means of exercising the same right; (3) the effect proposed accommodations will have on prison resources; and (4) whether the existence of 'obvious, easy alternatives' that impose a *de minimis* cost" reflect the unreasonableness of the regulation. <u>Salaam v. Lockhart</u>, 905 F.2d 1168, 1171 (8th Cir. 1990) (quoting <u>Turner</u>, 482 U.S. at 89-91).

      1.      <u>Reasonable relationship to Penological interests</u>

<u>Turner</u> first requires the existence of "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89.

10

Legitimate penological interests include the deterrence of crime, rehabilitation of prisoners, and institutional security. Monmouth County Corr. Instit. Inmates v. Lanzaro, 834 F.2d 326, 333 (3d Cir. 1987) (citations omitted). See also O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Procunier, 416 U.S. at 412.

Defendants put forth the following reasons to justify the Policy: (1) security concerns; (2) conservation of prison resources, both in terms of costs and availability of staff, and (3) the possibility that transport of an inmate for an abortion will delay other scheduled medical appoints; and (4) the existence of a state statute prohibiting the use of state funds or facilities for an abortion.

Out of the many penological interests put forward by Defendants, only Defendants' purported security interest constitutes a valid penological interest. The other asserted interests – conservation of prison resources and the possibility that transport of an inmate for an abortion will delay other scheduled medical appointments – are not independent valid penological interests and are more appropriately considered under Turner's third prong. Lanzaro, 834 F.2d at 336-337 & n.18. Defendants also argue that the existence of a state statute prohibiting the use of state funds or facilities for an abortion justifies the Policy. While a state certainly has a legitimate interest, penological or not, in abiding by its own laws, as discussed below, this argument fails as a matter of law.

          a.          Security Concerns

As a threshold matter, Plaintiffs argue that Defendants' concern for security in no way motivated Defendants' change of policy and is little more than post-hoc rationalizing. Instead, Plaintiffs argue that the undisputed facts show that implementation of the Policy was triggered by politics and budget cuts and that Defendants are therefore not entitled to Turner deference. Quinn

v. Nix, 983 F.2d 115, 118 (8th Cir. 1993) (prison officials are "not entitled to the deference described in Turner . . . if their actions are not actually motivated by legitimate penological interests at the time they act."). While the combination of undisputed facts relied upon by Plaintiffs for this proposition certainly implies that Defendants did not consider security implications in implementing the Policy, because this motion is one for summary judgment, the Court is obliged to view all facts and draw all inferences in favor of the non-moving party. Anderson, 477 U.S. at 252-255. Accordingly, the Court will, for the purposes of this motion, accept the proffered security concern as credible and assess whether the Policy rationally and actually advances this legitimate government interest.

Every prisoner transport raises a variety of security concerns, for the prisoner, the guard(s), and third parties. In this case, the undisputed evidence shows that inmates who choose to terminate a pregnancy and must be transported outside of prison for that purpose pose no greater security risk than any other inmate that requires outside medical attention. Lanzaro, 834 F.2d at 338. Seven days a week, Defendants transport many different prisoners off-site for medical and non-medical reasons, averaging nearly 200 transports each month at WERDCC alone. Out of these thousands of outcounts over the years, only ten transports have occurred for abortion procedures from 1998 - 2005, all without incident.

Defendants raise numerous arguments, none of which present a genuine issue of material fact on this point. They first claim that there are greater security concerns for inmates on outcounts to receive abortion services because of the presence of picketers at facilities providing abortion services. Defendants fail to present any material fact showing that the presence of picketers in fact increases security concerns. Rather, it is undisputed that in the past eight years, picketers have never interfered with the safety or security of DOC inmates or staff. Next, Defendants claim that inmates

transported for abortion are more likely than other pregnant inmates on medical outcounts to attempt an escape. Defendants again fail to offer evidence substantiating this claim. Conversely, the undisputed evidence is that, unlike inmates transported for labor and delivery, inmates on abortion outcounts are restrained both during transport and upon arrival at the facility. Lastly, Defendants contend that abortion outcounts result in reduced security in the prison facilities. The undisputed facts show that coverage at WERDCC is not reduced because officers are specifically assigned to transport shifts and additional officers are scheduled in advance to cover extra transport shifts as necessary.

The undisputed evidence shows that Defendants' Policy is not related to any perceived security risks. It prohibits transports for *all* inmate elective abortions - regardless of the specific security risks posed by a particular inmate, thereby impermissibly centering "around the nature of the treatment." Lanzaro, 834 F.2d at 338.

      b.      Missouri State Prohibition on the Use of Missouri State Funds to Assist with an Abortion

Defendants also argue that the Policy is justified on the grounds that (a) the State of Missouri is not constitutionally obligated to subsidize nontherapeutic abortions; and (b) Missouri law prohibits the use of Missouri funds to assist with an abortion not necessary to save the life of the mother, thereby justifying the Policy.

Defendants' arguments on this point are less than clear. First, this case simply does not concern state subsidization of abortion services. To the extent that Defendants argue that Missouri is not constitutionally obligated to subsidize abortion services, they fail to address what would be the relevant point - whether providing transport to an inmate to receive an abortion constitutes the

13

use of public funds to obtain an abortion. However, the issue of whether Missouri's statutory ban on assisting an abortion prohibits transport of an inmate to a medical facility for the procedure is already a matter of established Eighth Circuit law. Upon the State's urging, the Eighth Circuit rejected this very argument in Reproductive Health Servs. v. Webster, 851 F.2d 1071, 1084, *rev'd on other grounds*, 492 U.S. 490 (1989), holding explicitly that Missouri law prohibiting the use of Missouri State funds to assist with an abortion does not encompass transport to the location where the procedure is to take place:

> We cannot accept the conclusion that "assisting" an abortion encompasses driving or escorting the patient to the location where the procedure is to take place. The abortion itself does not take place in the vehicle or as the patient is being escorted. We think a more reasonable interpretation of the phrase "assisting an abortion" is the one suggested by the state: direct participation in the surgical procedure itself . . . the statute does not prevent state employees from arranging for abortion procedures for inmates or from transporting and escorting inmates to abortion facilities.

Id. Defendants appear to contest this ruling by citing the Supreme Court decision in Webster v. Reproductive Health Servs., 492 U.S. 490, 509-10 (1989) as follows: "Having held that the State's refusal to fund abortions does not violate Roe v. Wade, it strains logic to reach a contrary result for the use of public facilities and employees." This statement, however, is inapplicable to the use of Missouri *funds* in assisting with an abortion. The Court of Appeals for the Eighth Circuit clearly ruled that Missouri law prohibiting the use of state funds did not include driving an inmate to a location to receive an abortion and the State of Missouri did not appeal that issue to the Supreme Court.

2. Inmates' Ability to Otherwise Exercise Their Right

"A second factor in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S.

14

at 90. Unless Defendants provide the necessary transportation, Plaintiffs are unable to exercise their right to choose to terminate their pregnancy. Defendants argue that a plaintiff is not completely barred from exercising that right as a plaintiff may obtain an abortion before the incarceration term commences. Turner analyzes the prison regulation, as applied to inmates, not as applied to individuals before incarceration. Id. at 90. It is clear that unless Defendants provide transport for inmates to receive abortion services, there is no alternative way for an inmate to obtain a nontherapeutic abortion.

### 3. The Effect of Accommodation of the Right on Prison Resources

A third consideration under Turner is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id.

It is undisputed that the impact of a woman's right to terminate a pregnancy does not increase the burden on prison resources, including guards and other inmates. Defendants argue that abortion outcounts will force the rescheduling of other scheduled medical appointments for prisoners and that such a need to reschedule will unduly burden prison staff. The facts present the contrary — abortion outcounts have no distinct or measurable impact on the ongoing prison need to schedule and reschedule many medical appointments. At the WERDCC, Defendants average almost 200 outcounts per month, 155 of which are for medical care. Defendants admit that conflicts and rescheduling of transport of inmates for off-site medical care are regular occurrences and fail to present any evidence where the transport of an inmate for an abortion has hindered the medical care of another inmate, much less any evidence that the need to reschedule medical appointments for prisoners based on the need to schedule abortion outcounts unduly impacts prison resources.

15

Defendants also argue that the elimination of nontherapeutic abortion outcounts will conserve prison costs. The facts again contradict this argument. Only ten transports have occurred for abortion procedures from 1998 - 2005. In each instance, the pregnant inmate has been responsible for the cost of abortion medical care. In contrast, WERDCC, on average, has over 90 outcounts per year for delivery and pregnancy-related medical care, the cost of which is borne by the Defendants. In addition, Defendants concede that the cost of transporting inmates for abortion is "minimal." In sum, the evidence shows that the "[a]ccomodation of the inmate's choice to terminate her pregnancy under the same terms currently available to pregnant inmates option for childbirth will impose no more, and indeed probably less, administrative and financial burdens on [prison] officials." Lanzaro, 834 F.2d at 341- 42.

### 4. Absence of Ready Alternatives and Existence of a Ready Alternative at a De Minimis Cost

Lastly, Turner declares that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner, 482 U.S. at 90.

Defendants' Policy prohibits all nontherapeutic abortions. Defendants argue that no alternative to the Policy exists, and therefore, the Policy is necessarily reasonable. This argument fails to consider the full extent of the Supreme Court's guidance in Turner. In discussing the absence of ready alternatives to a prison policy, the Turner court stated that if an inmate is able to point to "an alternative that fully accommodates the prisoner's right at *de minimis* costs to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91.

The evidence shows that Defendants can fully accommodate Plaintiffs' rights at a *de minimis*

16

cost to security, the penological interest articulated by Defendants. As discussed above, provision of abortion outcounts does not affect valid security interests. Indeed, Defendants have accommodated the right with little difficulty since 1998. It is clear that the past practice of providing transports has proven to be a ready and workable alternative to the current Policy, evidencing that "the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." Id. at 90.

IV.     Eighth Amendment

Plaintiffs also allege that Defendants' Policy violates the Eighth Amendment because it constitutes deliberate indifference to inmates' serious medical needs. Under the Eighth Amendment, Defendants are obligated to "provide medical care for those whom it . . . incarcerat[es]." Estelle v. Gamble, 429 U.S. 97, 103 (1976). Estelle announced a two-pronged standard for Eighth Amendment claims: the challenged action and/or policy must (1) exhibit deliberate indifference on the part of prison officials and (2) the prisoner's medical needs must be serious.[6] Lanzaro, 834 F.2d at 346 (citations omitted).

Deliberate indifference is evident when officials erect barriers and outright denials to medical treatment. Id. at 347. Such deliberate indifference is unconstitutional only when it is directed toward a "serious medical need." As in Lanzaro, the relevant medical need in this case is the abortion services needed for inmates to terminate their pregnancies, if they so choose. Defendants argue, without legal support, that nontherapeutic abortion is not a "serious medical need." This Court adopts the reasoning in Lanzaro where the Court of Appeals for the Third Circuit found that denial of a nontherapeutic abortion constitutes a "serious medical need" under Estelle:

---

[6]Like the right to be free from discrimination based on race, the right to be free from cruel and unusual punishment is evaluated, not under Turner, but under the standard of review that applies outside of the prison, the "deliberate indifference" standard. Johnson, 543 U.S. at 511.

17

> In sum, it is evident that a woman exercising her fundamental right to choose to terminate her pregnancy requires medical care to effectuate that choice. Denial of the required care will likely result in tangible harm to the inmate who wishes to terminate her pregnancy. Characterization of the treatment necessary for the safe termination of an inmate's pregnancy as "elective" is of little or no consequence in the context of the Estelle "serious medical need" formulation. An elective, nontherapeutic abortion may . . . constitute a "serious medical need" where denial or undue delay in provision of the procedure will render the inmate's condition "irreparable."

Lanzaro, 834 F.2d at 349.

Having shown that Defendants intentionally deny Plaintiffs' the right to have an elective abortion, in conjunction with the Third Circuit's designation of a nontherapeutic abortion as a "serious medical need," Plaintiffs have established the absence of a genuine issue of material fact, and are accordingly entitled to judgment in their favor as a matter of law.

V.  Conclusion

For the forgoing reasons, the Court concludes that Defendants' Policy violates both the Fourteenth and Eighth Amendments of the United States Constitution. Plaintiffs' Motion for Summary Judgment (Doc. 57) is GRANTED. Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED

                                             /s/ DEAN WHIPPLE
                                             Dean Whipple
                                             United States District Judge

DATE:  July 18, 2006